We'll reserve decision. We'll take up the next case, which is Benx v. First Data. You ready to proceed? Yes, Your Honor. Go right ahead. Good morning, Your Honor. My name is Timothy McFaul of McGrodsky & Long, appearing on behalf of Plaintiff Appellant Benx LC. Excuse me. This is an appeal from the District Court's dismissal of Benx's claim for breach of the implied covenant of good faith and fair dealing in a contract between Benx and Defendant Appley, First Data Merchant Services Corporation. Benx is a small electronic parts distributor who contracted with First Data for credit and debit card payment processing services. The claim arises from First Data's failure to remit the refund of interchange and card grant fees to Benx. Benx paid these fees to the credit card issuing bank and MasterCard in connection with a February 2013 credit card sale. When Benx issued What's in the card member agreement for the repayment of these fees to your client? Your Honor, there is a provision in the MasterCard agreement that indicates that upon issuance of a refund, the sales transaction is reversed so that payment is no longer forwarded to the merchant in terms of the transaction price, the sales transaction price, and that positive interchange is also reversed. What does that mean? The interchange that was charged, the charge that was payable to the credit card issuing bank and to MasterCard, the card organizational brand. When there's a sales reversal due to a customer refund, for example, or a chargeback, what happens is obviously no payment is forwarded to the merchant. If it is forwarded, it is then sent back through the payment processing system to the credit card issuing bank for the benefit of the customer, and the monies that were deducted from the sales proceeds, the interchange fee and the card grant fee, are then refunded by the issuing bank and MasterCard. Who paid those fees to the issuing bank and to MasterCard under the pricing arrangement your client agreed to? We would submit that those payments were made by the merchant, Benex. No, no. That clearly isn't the case because your arrangement, your price that you paid for the services that you got is premised on a percentage or is calculated on the gross volume that you do with them. It's a volume thing. There's another pricing scheme that you originally thought was the scheme that was premised on what was actually paid to the card issuing bank, to MasterCard for managing all these things or fees or whatever. But that's not the pricing scheme you had. The pricing scheme you had was premised on that First Data was going to pay those fees and charge you a percentage of how much business you were doing, right? If I may, Your Honor, I believe that's actually correct. And I know that's a defendant's characterization of how this worked. And one of the reasons we have the demonstrative here is because I think it's significant in terms of— I have it right here. Yes, Your Honor. Your Honor, the gross transaction volume refers actually to discount fees, not discount rate. So contrary to what First Data indicates, it's not limited to the discount rate. Do you know—let me ask you this. Yes, Your Honor. Do you know how First Data calculated what it was going to charge you percentage-wise on your gross volume? Your Honor— I suggest to you that it was probably a function of what their costs were. And so they had costs for people who were operating and maintaining devices that communicated with MasterCard. They had back office staff that probably reconciled other matters. They had costs, and they probably also factored in those costs some fees that they might recover when there were returns made and they got refunds for MasterCard. But the fee that you were charged was not premised on the fact that they were advancing your money. The fee that they charged you was premised on volume, not on the cost of what their costs were with regard to MasterCard fees specific to your transactions. Right? Your Honor, if I may, right or wrong? Am I wrong or right? I believe you're wrong, Your Honor. I believe— I'm wrong? Yes, Your Honor. And the reason is that the discount rate is not tied to volume. The discount rate is a percentage that's charged per transaction basis. First Data indicates that it's charged on volume. And the reason is that they're trying to associate the discount rate and bring in the language based on gross transaction volume. As indicated, though, in the application form, that heading, discount fees based on gross transaction volume, also applies to the IC pass-through plan. Well, that may be the case that they may decide that on the IC pass-through rate, the price is as follows. It's what they actually pay on those fees, and then some percentage in addition, their cost. Their cost above it. Because if they're in the business of just paying the fees for you, they're not going to make any money because they have costs with operating that. So it makes perfect sense that it would be a function also of volume to some degree. But there is definitely two pricing schemes, right? Absolutely. And so then one is premised on actual fees paid plus a percentage based on gross volume. And the second is just a straight-up fee on gross volume. And so, therefore, one assumes a risk that there might be returns and you might get some money back. And the other assumes a risk that you much prefer the high volume. It might be a lower cost, but you much prefer the high volume. And so, therefore, there are no fees to come back to. Your Honor, why doesn't that make sense? Your Honor, if I may, there's nothing in either the application form, which constitutes part of the agreement, or the program guide, which indicates that any portion of, well, let me back up, that references the refund of interchange of car brand fees at all. There's certainly nothing in the agreement, in the 66-page agreement, that indicates that these merchants receive the refunds of the interchange of car brand fees, and these merchants do not. But then now I'm back to Judge Parker's question. Where is your right to get the money back? Your Honor, where? Just show me where in your big, beautiful exhibit, A41 or A42, show me the writing in a commercial agreement between two merchants. Your Honor, what we would respectfully submit is that the contract. I just asked you for a page. I'm not asking for an argument. I'm asking for a page. Okay. Your Honor, the agreement provides that first data is paid in connection with or in consideration of the services that it provides. And that appears at page A66 of the program guide, section 18.1. Specifically, it says, in consideration of the services provided by us, you shall be charged and hereby agree to pay to us any and all fees set forth in the agreement. And then it continues. And that provision applies to both the IC pass-through plan as well as the discount rate plan used by Bennex. What we would submit is that when a sales transaction is reversed and the monies that were paid to the issuing bank and the card brand, here MasterCard, are refunded back through the interchange system, what happens when they're retained by first data is essentially first data is experiencing a windfall, that they're being paid without having provided services. They're experiencing the windfall because the amount that they keep on the return bank is about five times what they kept on the outgoing fund flow, right? It is, Your Honor. And it's also monies that they're receiving without providing the services as requested. Why didn't you ask for it back? You're a merchant. You see the agreement. You haven't told me yet the language, other than the fact that they're going to get some of this money back. That money may very well factor into how they price and charge you a percentage. But unless you asked for it to get back, I don't understand how you're entitled to get it back. Your Honor, Bennex, like most merchants who utilize the discount rate plan, simply are unaware that the issuing bank and the card organizations or card brands refund those fees. There's nothing in the 66-page contract that indicates as much. There's nothing in any of the materials that first data. And if you look at the exhibits that are in the record, 829 and 830, your argument is that if you're Bennex and you look at what first data sends you, you can't tell that they kept the 80 percent of what you had originally been charged.  But if you were a pass-through customer, you'd know. Well, if you're a pass-through customer, certainly you know what portion of it, what portion of what you're being charged by first data, goes toward paying the interchanging card brand fees and what portion of it is their discount rate or markup, because they're also charged a discount. Are they entitled to keep what their costs are on the first round of transactions? Because you would agree that they have costs on the first transaction. Absolutely, Your Honor, and they have costs. And on the return, do they have a cost? They do, and they charge for those services. They charge Bennex for those services, and they were paid for those services. What do they charge the pass-through people in terms of costs on refunds or exchanges, refunds? Your Honor, unfortunately, it's not on this page. I believe that Mr. Levine would be better positioned to answer what that specific amount is because it's actually a blank that's filled in. I can tell you that for Bennex, it was 20 cents per transaction, processing the reversal of the sales transaction. So on a customer refund, they charge those additional monies. That charge appeared on the monthly statement that first data provided to Bennex. Bennex paid that. So they were charged that. I'm sorry. They were paid for the services that they provide in connection with the reversal of the transaction. Are you arguing that this is like a contract of adhesion? Is that your argument? You haven't made that claim. Well, Your Honor, we have not, but we have made the claim that or a certain – You put a simple contract claim between merchants using New York law, right? That's correct, Your Honor. And you've added an implied covenant of good faith and fair dealing. So I still have to ask you, what specific provision is it that they breached? Your Honor, we would submit that they breached section 18.1 at page 866, which, as I previously indicated, provides that they are paid in consideration of the services that they provide. But I thought your theory was that they breached an implied covenant of fair dealing. Yes. So if they breached a specific provision of the contract that dealt with this subject matter, how can they at the same time breach a covenant of fair dealing? You're correct, Your Honor. They cannot. And what I'm actually referencing here is the contractual basis of the benefit that the parties believe derives from the contract, which is a requirement of the implied covenant of good faith and fair dealing. I'm sorry. I don't understand what you just said. I'm sorry. Section 18.1, we believe, gives rise to the reasonable expectation on the part of Benex that it would receive services in exchange for the monies that it pays to First Data. Strictly speaking, First Data did not breach 18.1. You didn't plead a breach of contract. I'm sorry, Your Honor. You never pled a breach of contract. No, Your Honor. Because of action in your complaint, right? No, Your Honor. That is correct. And to the extent that I suggested that they breached 18.1, I misspoke. What I mean is that 18.1 actually provides the benefit to which Benex had a reasonable expectation. And while it did not strictly breach 18.1, that its failure to either provide services in exchange for the refunded fees that it retained or its failure to refund those fees when it refunds those fees to the I.C. Pasadena merchants constitutes a breach of the implied covenant of good faith and fair dealing. Thank you, Mr. McFaul. I know you reserved a couple of minutes, and we'll still give you those. Let me hear from Mr. Levine at this time. Thank you, Your Honor. May it please the Court, Mr. Levine for First Data. I want to get right to the question that both Judges Parker and Wesley asked, where you asked about what provision in the contract. That's relevant to an implied covenant claim as well. Because all that an implied covenant claim is, is a species of contract claim. And what it does is it has to act in furtherance of provisions that are in the agreement. The point is, is that sometimes in a contract, you know that people are entitled to certain benefits. However, they can act within the letter of the contract in a way that would deprive the other side of those benefits under the contract. To this date, through three rounds of briefing, two rounds of briefing in the district court, and one round of briefing here, Benex has failed to point to anything in the contract, any benefit that they were guaranteed under the contract, an express benefit, that the court would need to imply into the contract, a refund obligation, in order to ensure that they were not deprived of that benefit. The only thing that he pointed to at first when you – Under the contract, let's just break this down and tell me what I'm missing. Under the contract, let's say Benex, on a sale, is paying you five bucks for services. And you're going to transmit the funds to the card company, and they go into the bank, et cetera, et cetera. So the sale doesn't go through. The money comes back the other way. You keep the money. That's correct. Why is that fair? It's fair because that's how the contract is set up. We agreed with a merchant. We have two types of pricing schemes that are well known in the industry. There's discount rate pricing and there's interchange plus pricing. If you want one where you only pay the interchange plus a markup so that you get the interchange back, you select interchange plus. Under the contract, how this works is we charge a price. We charge 2.69% on transactions. It's a price, period. It doesn't – they try to say that our price needs to be broken down into costs and that we are merely a conduit. There is nothing in the contract that says that we are merely a conduit. In fact, everything in the contract says exactly the opposite. These are sites that they have. If you look at the blue brief, at pages 7 and 26, they're citing page A44 of the contract. That describes interchange charges as charges that we, First Data, must pay to the issuing banks. At pages 14 and 25 of the blue brief and also at paragraph 27 of the amended complaint, they cite page A53 of the contract. That's in the record. That says that the card organizations charge the acquirers interchange fees and assessments for submitting transactions into their systems, which, by the way, we do pay every time we submit a transaction into the system, whether or not it's refunded or not. The acquirers are First Data. As all the briefs say here, everyone concedes there's no dispute that we act as the acquirer in this transaction. It goes on. You can look at the amended complaint, paragraph 31. That's at A326 of the record. That's the First Data glossary. It defines the interchange fee as fees paid by the acquirer to the issuer. And, again, in this, they even cite this Court's Wal-Mart decision at page 10 of their reply brief, which describes this well-known fact the exact same way, that the acquirer pays the issuing bank. There is nothing in this contract that says we are only a conduit. What the contract does say is we will charge you a 2.69 percent price on transactions. What the contract does not say is that we will ever provide you any refund of that price for any reason, much less interchange. How does the Interchange Plus option, how is that different? Sure. Do you agree to that? Sure. So the Interchange Plus option, the way it works, again, this is well-known in the industry. They cite articles in the reply brief that talk about Interchange Plus. We don't want custom. We want contract provision. Sure, sure, sure. So the way that Interchange Plus works is that you only pay the interchange rate. So let me, if I can, I'm going to walk over here and I'm going to show it to you. Over here it says Interchange PASTA. That's the column. If they had selected Interchange PASTA, what you would have seen in these two provisions right here is the markup, the plus in Interchange Plus. They are saying that there's confusion here. They're saying how can we be paying refunds under Interchange Plus if this header, discount fees based on gross transaction volume, applies there, too? And there's a reason, because you only pay the applicable interchange rate. The gross transaction volume applies to discount fees. It applies to this discount rate, these discount rates right here, which are the markup, the 0.2% or the 0.4% or something like that. That does apply to gross transaction volume. But the interchange rate, you pay the actual interchange rate. If there's a refund, the way it actually works in the system, and they know because this is in the interrogatories the way it worked here, when there was a refund here, there was actually a negative interchange rate charge. It's called the commercial refund rate. If you are paying the applicable interchange rate, you get that back under Interchange Plus. But to be clear, they are trying to sow confusion about a contract they didn't select. We're here to interpret the contract that they did select. We think that under our contract, it's absolutely clear. It says it's a 2.69% price. It does not say that you get any refunds. And under the implied covenant, you can't imply a term into the contract that would fundamentally transform it or that would be inconsistent with the terms that are actually there. If you imply the refund obligation here that they are asking for, that would mean that we don't actually get to charge 2.69%. Sometimes we get to charge less. So that's why it changes the fundamental premise of the contract, which is we'll charge you a price. Pick one over the other. So one reason. The interchange pass-through as opposed to the discount. More predictability. Sorry, not the pass-through. The other way around, why you would pick discount rate over it. More predictability, you know, 2.69%. There's probably 500 categories of interchange rates. And if you're doing Interchange Plus, it might depend on what category you're actually going to do. There's a whole range of rates that if you're choosing the discount rate here, you're just going to get 2.69%. You have some sort of predictability for that. But I want to be clear, too. Sometimes it's not the merchant's choice. Sometimes, you know, First Data may only enter into a contract on certain terms because they're not willing to assume risk in other circumstances. But that's the reason why one would. So far what I've told you is just our basic fundamental argument, which the district court credited in its first decision on the first motion to dismiss, which is at the Special Appendix 10. They said, she said as well, this is not a contract under which First Data is merely a conduit. This is a price. And if you treat it any other way, you're jettisoning the terms of the contract. We think there's actually a cherry on top of that, and that's the gross transaction volume term. Gross is defined in the contract to mean all of the transactions, excluding any refunds or setoffs. That means if you were to imply a refund obligation into this contract and say that your pricing actually does have to take refunds into account, it would directly contradict that part of the contract. Now, they argue a lot about what this means, whether it's a heading, whether it really should apply. But at the end of the day, they don't actually disagree that the 2.69% gets charged on transactions. In other words, when they ask for a refund here, they're not saying take our refund and give us 2.69% of that refund. They're only saying they want the interchange back. So they're not even disagreeing that the 2.69% applies to the transactions. So for both of those reasons, we think that you absolutely can't imply a refund obligation into this contract that is nowhere provided for in the contract, would fundamentally transform the nature of the contract, and that specifically contradicts the gross transaction volume term, which says that the pricing has to be based on the gross transaction volume, excluding all refunds. They argue that it's a heading, and just to make sure so that I'm heard on this, we don't think that this is what counts as a heading that shouldn't be given any purpose in construction. The provision that talks about where headings are for convenience of reference and should not control over the actual provisions appears in the program guide. I think it's at A78. And what we think it means is that sometimes headers are just subjects that are for convenience of reference, so that you can find it in the contract. Where do I deal with this? And that there's a provision that follows that, and that you shouldn't let the heading control over the provision. That's not the case with this part of the contract. This is a form. Lots of people contract through forms. It's a simple form. If you actually said that all of these are headings that can't have any use, then we don't even know what the price of the contract is. That's everything here then would be a heading for that. This is not a mere subject matter that draws your attention here so that you know what provision. It is the actual provision in and of itself. So on top of all that, we can rest on our briefs on the argument, but I want to make sure I make one point because it came up in the other argument. On top of all of this, we think that they failed to give notice and failed to satisfy a condition precedent by telling us within 60 days that they had a problem. The only argument they're making on appeal is that they should be excused of that by the prevention doctrine, and they say, we didn't know you were getting the refund. We don't think that's true. It is a publicly known fact that there are these refunds, and they are citing all of these public documents that are attached to their complaint that say there are these refunds, and we didn't hide that from them. In fact, our contract encourages them to read the card organization rules. Indeed, even in Section 18 of the contract, we say, if you want information on interchange, go to these websites, and we tell them where to go at MasterCard. You didn't tell them that on the key documents, which was the account summaries you gave. That may be true, but the prevention doctrine is not something that says if you don't know something, you're excused from exercising a condition precedent. It's if the other side actually hinders you from doing it. The only allegation in this case, I believe it's at paragraph 53 of the amended complaint on this, is that we didn't affirmatively inform them of it. Once you drift over into should have known and information is all out there, you know, it gets harder and harder to resolve this on a 12-B or a summary judgment standard. I would agree with that if there were any allegation in here that we wrongfully did it. And I don't know that there's any. There is no allegation that we misrepresented anything in this contract. We were very clear to 2.69% price. Thank you, Mr. Levine. Mr. McFaul, you've got a couple of minutes. Thank you, Your Honor. Your Honor, just to be clear, the same contract that applies to the discount rate merchants, such as Benex, applies to the IC pass-through merchants. There's nothing in the contract that indicates these folks receive refund of the interchange fees and these folks do not. Except those parts aren't filled out, so it's clear that you're getting the gross amount, right? Your Honor, essentially, we would submit that what this states is that or what this provides is that the IC There's a blank there, so it's clear. And if this plan had been selected, that presumably would be filled out. What we would submit is that these folks are paying the same thing. But the discount rate merchants I don't understand. Here they are, but their pricing is done differently. What do you mean they're paying the same thing? I don't understand that. Yes, Your Honor. What the discount rate merchants are paying is the actual interchange rate charged on each transaction plus First Data's markup. But you haven't shown in any way, shape, or form how they got that price in the discount. And I would suggest to you that they made a decision. Somehow it's not. There's nothing here. They said, okay, we're going to charge you 2.69%. How they got that is a function probably of their actual I would suspect of their actual costs, part of which are interchange fees, part of which are labor costs, part of which is debt reduction, part of which are utilities, part of which are lots of things, and some of which may also reflect the fact that they expect in the industry that they'll get some refunds which drive their costs down. But you somehow think that because they paid the fees as part of their costs, you're entitled to a refund of it, but you've not in any way shown, any way, shape, or manner shown that under that agreement, that the discount rate of 2.69% is a function solely of interchange fees or some other calculation that somehow ensures that you'll get a refund if they do. Nowhere. Your Honor, the contract, I believe it's at section 18, indicates that the discount rate is determined by anticipated assumptions based on anticipated annual volume. The discount rate presumably for the ICPAS and merchants is based on that same set. What difference does it make to Bindex how that's calculated, how the 2.69 is calculated? We don't believe that. Oh, but Bindex just wants to know, you know, what's using this MasterCard or Visa or whatever going to cost me? And they're told it's 2.69. And they pay that fee and they get the services promised them. I don't understand at this point why if First Data is able to provide that service in a way that increases First Data's profit off the 2.69, you're entitled to share in that. Your Honor, we submit that the contract makes clear, and it does indicate that a substantial portion of the 2.69 is paid to the issuing bank and the car brands as the interchange of car brand fees. Of course, it's part of the cost. I'm sorry, Your Honor? Of course, it's part of the cost. Yes, Your Honor. What they charge you. If the charge had gone up, if for some reason First Data's expenses of doing business had gone up, you wouldn't agree that they could come back to you for more money. Yes, Your Honor. In fact, in our papers we indicate as much. There are multiple provisions in the program guide which provide that if there are increases in the interchange rate, if there are additional assessments, if there are fines, penalties, et cetera, that it's passed through to the merchant. So if there are increases in First Data's costs, it passes them along to us. If I signed another agreement, I'd ask for the refunding of any return. Does it provide? I bet you the rate you're going to pay is going to go up. Your Honor, we would submit that the merchants, right? This is New York. Yes, Your Honor. But we would submit, Your Honor, that there is nothing in the contract that would indicate to Bindex or anybody else that there are ever refunds of the interchange rate and car brand fees. There just isn't. The retention of those fees by First Data, where it does not retain those fees here, we would submit breaches the contract where both agreements apply. I'm sorry. Both plans are subject to the same. If Bindex, if First Data had developed a more sophisticated computer system that let it do its part of the work, for which it was paid, what, 60 cents? How much did they get to keep? It was .48 percent of the transaction. Okay. So let's say they developed a more sophisticated computer program that let them do their work cheaper. Would you have been entitled to share in that saving? No, Your Honor. And I believe that that's a cause, that's a consideration that would have been made in the pricing determination. Your Honor, all work were. You say that they could pass through increases. Does the contract require that they reduce their discount rate if the interchange fees go down? No, it does not, Your Honor. It doesn't? No, it does not. So you know that you're on the nut for that if the interchange fees go down, right, to them? You're going to still pay the 2.69 percent, right? That's correct. You're going to want your money back if they get a refund, right? Yes, Your Honor, because that's money for which. Okay. And why are they not entitled to reduce it? Because the contract doesn't allow it? Is that it? I have not stated that they're not allowed to reduce it. All right. Thank you, Mr. McFaul. We'll reserve decision on this case. Our last case is on submission. So I'll ask the clerk.